**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| TAYLOR ENERGY COMPANY LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:09-cv-01029-ESH |
| ) | |
| UNITED STATES DEPARTMENT OF THE ) | |
| INTERIOR, et al. ) | |
| ) | |
| Defendants. ) | |

---

**FIRST AMENDED COMPLAINT**

Plaintiff Taylor Energy Company LLC ("Taylor") hereby alleges as follows:

**NATURE OF THE ACTION**

1.     This case concerns whether the Minerals Management Service ("MMS") may publicly disclose Taylor's confidential and proprietary financial and commercial information to third parties over Taylor's objection.

2.     On May 18, 2009, MMS issued a final decision (the "May Decision") to disclose four cover letters requesting disbursements from a Trust Fund MMS established to fund Taylor's ongoing decommissioning of oil and gas wells and related activities located on the federal Outer Continental Shelf ("OCS") in the Gulf of Mexico (former Lease OCS-G 04935 (Mississippi Canyon ("MC") Block 20)).  Taylor had agreed to the disclosure of three of the cover letters (the earliest dated letters) with only limited redactions.  Relevant to this litigation, as characterized by MMS, Taylor redacted specific "dollar amounts for certain disbursements" in the cover letters.  MMS rejected these limited redactions, indicating its intent to release Taylor's cover letters in their entirety.

3.      MMS' May Decision also announced MMS' decision to disclose the fourth disbursement request cover letter dated April 6, 2009, although MMS has afforded Taylor no opportunity to assert confidentiality as required by law.  On information and belief, Taylor also is concerned that MMS will similarly seek to extend its disclosure decision to apply to subsequent disbursement request cover letters, including the most recently submitted such cover letter on May 4, 2009, without further consulting Taylor as to confidential dollar amounts or other sensitive information that may appear in those cover letters.

4.      On August 10, 2009, Taylor received a subsequent final decision by MMS (the "August Decision") to further disclose the "Trust Agreement" establishing the aforementioned Trust Fund.  As with the cover letters, Taylor had communicated to MMS its agreement to disclosure of the Trust Agreement subject to limited redactions of analogous "dollar amounts," as characterized by MMS, for "the initial deposit, certain payments and hold back provisions." In addition, Taylor sought to redact "Taylor's federal tax identification number," "the Trust Account number," and "specifics on the schedule of fiduciary fees;" as indicated in MMS' May 18 letter, the third party requester has accepted these latter redactions.  Nevertheless, MMS rejected Taylor's redactions and indicated its intent to release the Trust Agreement in its entirety.

5.      In accordance with Taylor's ongoing practice to assert and maintain confidentiality judiciously and only for its most sensitive information, and in order to conserve the Court's resources, Taylor maintains its present objections before this Court only as to the portions of the MMS Decisions that would release Taylor's specific redactions of the above-mentioned "dollar amounts" and other financial information.  Specifically, Taylor no longer objects to release of "the name of the financial institution acting as trustee" found in the disbursement request cover letters or the Trust Agreement.

6.     The two MMS Decisions to release Taylor's confidential information violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  The MMS Decisions are individually and collectively arbitrary and capricious because the redacted information to be released falls within Exemption 4 of the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(b)(4), and thus, under the well-established law in this Circuit, must be withheld.  The relevant information also is covered by the Trade Secrets Act ("TSA"), and thus the MMS Decisions are "not in accordance with law" and in excess of MMS' statutory authority.  This information goes to the heart of Taylor's business model and purpose and embodies the details of Taylor's business costs to carry out ongoing decommissioning activities unrivaled in their technical complexity.  Disclosure of this information would substantially disrupt Taylor's ability to conduct its business.

7.     Taylor respectfully requests that the Court declare MMS' May Decision unlawful; declare MMS' August Decision unlawful; declare the May Decision limited to the four disbursement request cover letters presently before the Court; and permanently enjoin the release of the protected information in the disbursement request cover letters and the Trust Agreement.

## CONFIDENTIALITY OF FILINGS

8.     Taylor intends to file a Motion to Seal, pursuant to LCvR 5.1(j) and LCvR 5.4(e)(2), and the following attachments thereto:  i) a copy of the May Decision and the August Decision; ii) copies of the four unredacted Taylor disbursement request cover letters appended to the May Decision and a copy of the unredacted Trust Agreement, that are the subjects of this action; and iii) a second set of copies of these same cover letters and the Trust Agreement, highlighted to reflect the redactions as submitted by Taylor to MMS for which Taylor continues to maintain its claims of confidentiality.  The Motion to Seal will respectfully request that this

Court order the attachments thereto to be maintained as confidential (apart from the Complaint and the Motion to Seal itself which may be publicly disclosed).

9.      The attachments to the Motion to Seal will be provided under seal to the Court in order to afford the Court an opportunity to fully review the confidential information and Taylor's specific proposed redactions.  The filing of the Complaint or the Motion to Seal in no way constitutes an authorization by Taylor for the public disclosure of those attachments.

## JURISDICTION AND VENUE

10.      The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) because this action arises under the APA and also involves the application of the APA and the TSA.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because the Defendant agencies are located in the District of Columbia.

12.      No administrative appeal is available from either MMS Decision.  The May Decision provides:  "Should you wish to appeal this decision, you may do so following the requirements set forth in 43 CFR 2 Subpart D."  Yet, these cited regulations govern only appeals by FOIA requesters to compel disclosure of withheld information; they provide no means by which a submitter may enjoin an agency's disclosure.

## PARTIES

13.      Plaintiff Taylor Energy Company LLC is a United States corporation, with its principal office and place of business at 1615 Poydras Street, Suite 500, New Orleans, LA 70112.  It is engaged in, among other things, the business of providing and marketing decommissioning services on the OCS.

14.     Defendant Department of the Interior is a federal agency of the United States within the scope of 5 U.S.C. § 701(b)(1) (APA) and 28 U.S.C § 1391 (venue).  The Minerals Management Service is a sub-agency of the Department of the Interior, and is also within the scope of 5 U.S.C. § 701(b)(1) and 28 U.S.C § 1391.  Defendant Lars Herbst is the Regional Director of the MMS Gulf of Mexico OCS Region and is a Defendant in his official capacity, in which capacity he signed and issued both MMS Decisions at issue in this action.

15.     For ease of reference, Defendants are collectively referred to herein as "MMS." Moreover, Taylor and MMS may be collectively referred to herein as the "Parties."

### LEGAL FRAMEWORK

16.     FOIA authorizes agencies to disclose certain information upon a request for records.  However, Exemption 4 of FOIA protects "trade secrets and commercial or financial information obtained from a person and privileged or confidential" that might otherwise be subject to disclosure under FOIA.  5 U.S.C. § 552(b)(4).

17.     The TSA, provides, among other things, that any federal government officer or employee who "publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation, or association; . . . shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment."  18 U.S.C. § 1905 (titled "Disclosure of Confidential Information").

18.     Because the TSA is at least coextensive with Exemption 4, information falling under Exemption 4 must be withheld.  Therefore, unlike other FOIA Exemptions, Exemption 4 constitutes a mandatory bar to disclosure of information within its coverage and affords agencies no discretion to determine otherwise.

19.     FOIA contains no provision whereby a third party may claim special or exclusive status to obtain information.  Therefore, deliberative disclosure to any third party may result in broader disclosure pursuant to any subsequent public request.

20.     There exists no independent statute or regulation otherwise authorizing the disclosure of the type of information at issue to any third party.

## FACTUAL BACKGROUND

### A.     Overview of Relevant Documents Pertaining to Work at MC Block 20

21.     On September 16, 2004, Hurricane Ivan triggered a massive mudslide which toppled an oil and gas production platform at MC Block 20, located in approximately 440 feet of water.  The event deposited in excess of 100 feet of mud and sediment over 28 adjoining oil and gas wells.  Taylor was the lessee and operator of MC Block 20 at the time.  As lessee, Taylor is required to perform decommissioning activities now that production operations have ceased.  30 C.F.R. 250.1700, *et seq*.  Subsequently, in conjunction with MMS, Taylor has undertaken substantial efforts, unprecedented in their technical complexity, to study the extent of damage onsite, monitor for pollution and any environmental risks, and devise a permanent solution at the site.

22.     On March 19, 2008, Taylor and MMS entered into a Trust Agreement to establish a secure funding mechanism for Taylor to "fulfill certain obligations to plug and abandon wells, remove a portion of the platform and facilities, clear the seafloor of obstructions, and take

corrective action associated with wells and facilities" on the relevant OCS leases.  MMS required that the Trust Agreement with Taylor, which provided the funding procedure for the decommissioning of MC Block 20, be finally executed as a prerequisite to MMS approving assignment of all of Taylor's other OCS leases to another private entity pursuant to a sales agreement worth hundreds of millions of dollars.  This sales agreement, having already been delayed, was scheduled to close on March 20, 2008, the day after MMS actually signed the Trust Agreement.  In short, MMS required execution of the Trust Agreement to ensure that proceeds from Taylor's forthcoming sale of its other OCS leases would be available to fund the decommissioning of its only remaining OCS lease, MC Block 20.  Taylor funded the Trust Fund, to date, entirely with its own money, principally with the proceeds from the March 20, 2008 sale.

23.     Pursuant to the terms of the Trust Agreement, funds from the Trust Fund may only be disbursed to Taylor for its decommissioning work performed at MC Block 20.  Any such disbursement requires MMS' advance approval.  Taylor is presently proceeding with onsite decommissioning activities pursuant to a Draft Work Plan, as called for by the Trust Agreement, submitted to MMS on May 19, 2008.  Based on Taylor's gaining valuable technical experience in decommissioning the first few wells over the next several months, Taylor will prepare and submit, and the Parties will negotiate, more detailed future iterations of the Draft Work Plan to determine a reasonable and fair course of action for the remaining wells.

24.     On November 20, 2008, the Parties executed a Disbursement Agreement to set forth detailed procedures whereby Taylor may request and collect timely disbursements from the Trust Fund essential to Taylor's (and its contractors') ability to proceed with its obligations under the Trust Agreement and Draft Work Plan.  Each Taylor disbursement request typically must include supporting documentation substantiating the need for disbursements from the Trust

Fund and the specific activities to be funded.  Disbursement requests are limited to Taylor's actual costs to perform any particular phase of work (e.g., pipeline removal, platform removal, or plugging and abandoning one of the wells) detailed in the Trust Agreement, and are limited to the maximum amounts established in the Trust Agreement for each phase of work.

25.     As of the date of filing of this Complaint, Taylor has submitted five disbursement requests for various work (November 24 and December 1, 2008, January 20, April 6, and May 4, 2009).  To facilitate MMS' review and permit the prompt authorization of needed disbursements from the Trust Fund, Taylor prepared and attached a cover letter to each disbursement request.  In addition to the specific work performed and the other pertinent information such as details regarding Taylor's contracted drilling rig, the cover letters also include the associated cost of the work performed and the identity of the trustee.  Taylor also submitted detailed payment information and documentation as attachments to the various cover letters.

26.     The Trust Agreement and the four disbursement request cover letters addressed in and appended to MMS' May Decision are the only Taylor documents presently before the Court, and Taylor's objections pertain only to the release of the redactions Taylor has indicated therein. Should MMS subsequently elect to disclose unredacted versions of any other confidential Taylor documents, Taylor may amend this Complaint in accordance with the Court's procedural rules.

27.     At all relevant times, Taylor has considered its redacted information in the Trust Agreement and the disbursement request cover letters to be confidential and proprietary commercial and financial information within the meaning of the FOIA or trade secrets within the meaning of the TSA, and has protected it as such.

### B. Initial Communications Between Taylor and MMS Regarding Confidentiality of Taylor's Documents

28.     Confidentiality issues regarding Taylor's information first arose in the context of MMS' intended disclosure of certain documents to BP Exploration and Production, Inc. ("BP"), the former lessee at MC Block 20.  BP is not formally a party to the Trust Agreement between Taylor and MMS.  Yet, MMS considers BP, as the former lessee, to be liable for any decommissioning costs at the site that ultimately may not covered by Taylor.  On Taylor's information and belief, MMS thus provided information to BP about the discussions with Taylor regarding the execution of the Trust Agreement.  In addition, on the morning of March 19, 2008, hours before Taylor's deadline for both the sale of its leases and MMS' execution of the Trust Agreement, BP further advised Taylor by email that BP would not accept designation of the new third-party purchaser as operator in place of Taylor at the leases subject to the forthcoming sale until "BP receives assurance" that Taylor had fulfilled MMS' demand for financial security for MC Block 20.

29.     In the circumstances described in greater detail *infra* at ¶¶ 40-47, upon MMS' execution of the Trust Agreement on the evening of March 19, MMS characterized the Trust Agreement as "public information" and immediately provided it to BP.

30.     On June 20, 2008, MMS executed a unique and unprecedented agreement with BP pertaining to Taylor's submissions to MMS in conjunction with its MC Block 20 decommissioning activities.  This took place after execution of the Trust Agreement and MMS' sharing of the Trust Agreement with BP, and prior to execution of the Disbursement Agreement.  Nevertheless, the BP Agreement affords BP "certain limited rights," retroactively effective to March 19, 2008, the day that MMS executed Trust Agreement and shared it with BP.  Pursuant to this BP Agreement, MMS covenanted to, in relevant part, "provide BP with a copy of the

[Work] Plan. . . and . . . any . . . Trust Fund Release Requests . . . except to the extent these documents are exempt from disclosure under the Freedom of Information Act, within five (5) days of receipt by the MMS." MMS entered into the BP Agreement without Taylor's knowledge or participation. Moreover, as verified in MMS' FOIA request responses provided to Taylor, in no other instance has MMS entered into an agreement purporting to require MMS' mandatory disclosure to the other agreeing party of a third party's submissions.

31.     Between July 2008 and September 2008, the parties exchanged several oral and written communications regarding the disclosure of only the Draft Work Plan to BP.

32.     On December 19, 2008, Taylor sent an email to MMS identifying other confidential Taylor documents in MMS' possession.

33.     On February 2, 2009, MMS sent a letter to Taylor's counsel addressing for the first time the confidentiality of documents other than the Work Plan. Regarding the disbursement request cover letters, MMS instructed Taylor to identify the "specific passages you believe exempt and the FOIA rationale for withholding that information." Similarly, regarding the Trust Agreement, MMS directed Taylor to "identify those provisions [exempt from disclosure] and explain your rationale."

34.     On March 11, 2009, Taylor responded to the February 2, 2009 letter. Taylor expressed several general objections applicable to all Taylor documents denoted in MMS' February 2 letter. Ultimately, however, Taylor agreed to the release of the Trust Agreement and three disbursement request cover letters with only limited redactions to protect from public consumption Taylor's proprietary and confidential cost and other financial information.

35.     Nevertheless, MMS' May Decision and August Decision, albeit relying on somewhat different grounds, determined to disclose in unredacted form the cover letters and

Trust Agreement, respectively, to BP and to a third party FOIA requester.  However, on May 28,

2009, MMS issued an email to Taylor agreeing that, following Taylor's filing of this Complaint,

MMS will "not provide the letters to BP prior to a dispositive ruling from the court."  The parties

intend to imminently file a proposed joint stipulation with the Court to similarly preserve the

unredacted Trust Agreement pending judicial review.

### C. MMS' Decision to Release the Unredacted Trust Agreement

36.     On May 18, 2009, MMS responded to Taylor's March 11 letter.  This MMS letter

discussed several items for which Taylor had asserted confidentiality in its March 11 letter, but

constituted a final decision only to disclose the disbursement request cover letters (discussed

*infra* at ¶¶ 48-57).

37.     Elsewhere in its May 18 letter, MMS informed Taylor for the first time that

"MMS has received a formal request for the Trust Agreement."  MMS further stated that the

third party requester consented to Taylor's redactions save for the "dollar amounts for the initial

deposit, certain payments, and hold back provisions."  MMS found insufficient Taylor's asserted

basis for withholding this information, ignoring Taylor's consistent explanation elsewhere in its

letter for withholding similar financial information found in other documents.  MMS instructed

Taylor to submit additional reasons to prevent disclosure of the unredacted Trust Agreement.

38.     Only through subsequent inquiry by counsel for Taylor did MMS disclose that the

identity of the requester was Platts, a media entity specializing in energy news.  Moreover, MMS

apparently discussed Taylor's redactions with Platts before Taylor even knew a FOIA request

existed.  Thus, MMS failed to provide Taylor "prompt written notice of the request" as required

by law.  43 C.F.R. § 2.23(a).   Furthermore, Taylor has still not received "a copy of the FOIA

request."  43 C.F.R. § 2.23(b).

39.     Taylor responded with a letter to MMS on June 2, 2009.  In that letter, Taylor noted that MMS had failed to respond to many of Taylor's objections and cited authorities in its prior March 11 letter.  Taylor also proceeded to further justify confidential treatment for the redacted "dollar amounts" in the Trust Agreement and other analogous documents.  Specifically, Taylor highlighted the intrinsic value of cost information to perform complex and unprecedented decommissioning activities, and the economic harms that Taylor and its contractors would suffer upon free disclosure of this proprietary information to the public, including existing and would-be competitors.  Taylor's letter once again highlighted other contexts and precedent where similar types of information were afforded exemption from disclosure.

40.     On August 10, 2009, Taylor received the MMS August Decision subject to this action.  MMS summarily cast doubt on Taylor's arguments, but declined to "specifically address" them.  Instead, MMS asserted a novel position that "Taylor has already made the Trust Agreement public and, therefore, has waived its right to claim that any information in the Trust Agreement is confidential."  On that basis, MMS declared its intent to release the Trust Agreement to Platts within 10 days.  MMS never afforded Taylor an opportunity to discuss or rebut this novel claim prior to issuing this final decision.

41.     As the basis for its claim, MMS' August Decision cited and attached an email exchange between John Rodi (MMS), Frank Barber (then of Taylor), and Laney Vazquez (BP). MMS paraphrased the key communication from Mr. Rodi to Mr. Barber as follows:  "Mr. Barber was asked if MMS could provide BP a copy of the Trust Agreement and was informed that the release of the Trust Agreement to BP would make the document public information."  MMS then states that Mr. Barber "gave Taylor's authorization," and that "MMS confirmed that BP had received the Trust Agreement by fax."

42.     MMS' August Decision misreads this email chain and misinterprets its legal effect.  The pertinent, verbatim text from Mr. Rodi's email states, with reference to the Trust Agreement:  "Do you want me to also email a copy to BP?  I can guarantee they will ask for one as soon as I tell them the documents are executed and the documents are public information at this point."  Thus, contrary to the August Decision, Mr. Rodi mistakenly informed Taylor that the Trust Agreement was *already* public, *irrespective* of its disclosure to BP.  Based solely on that representation from a senior MMS official, Mr. Barber did not object to the limited release of the Trust Agreement to BP.  Taylor was never told, nor did it ever authorize or acknowledge, that the Trust Agreement would become "public information" upon release to BP.

43.     The particular circumstances surrounding the release also warrant against any waiver of Taylor's confidentiality claims.  Rather than a deliberative determination made in due course to publicly release the Trust Agreement, MMS effectively compelled Taylor to submit to its disclosure as an eleventh hour condition to execute the Trust Agreement and permit Taylor's sale of its other leases for several hundred million dollars.

44.     Despite the parties' extended negotiation of the Trust Agreement, Mr. Rodi raised the condition of disclosure to BP at the execution phase, and mere hours before Taylor's deadline to complete its sale of its corporate assets and its OCS leases other than MC Block 20.  This abbreviated timeframe offered Taylor little opportunity to consider the confidentiality concerns following release to BP or to contest disclosure.  Rather, such concerns were necessarily subordinated to the then-more pressing substantive issues with Taylor's sale of its assets, the successful completion of which hinged upon successful execution of the Trust Agreement's security for work obligations at MC Block 20, and the proceeds from which would be dedicated to fund the initial and later deposits to the Trust Fund for the MC Block 20 decommissioning

work.  As noted above, BP earlier that same day also communicated to Taylor that it would not agree to designation of the new purchaser as operator of the leases subject to the sales agreement until MMS had committed financial security for MC Block 20 decommissioning work.

45.     Moreover, the Trust Agreement has only been disclosed to BP to date.  Such limited disclosure does not automatically render the document publicly available or lessen the competitive harm to Taylor if it is disclosed again.  Rather, disclosure to a media outlet like Platts will certainly multiply the competitive harms to Taylor and its contractors.

46.     MMS also made the unique disclosure of the Trust Agreement to BP in the absence of any formal request.  BP emailed Taylor on March 19 only that it wanted "assurance" that Taylor had committed financial security at MC Block 20.  Mr. Barber forwarded that email to Mr. Rodi at MMS, requesting that MMS merely "let [BP] know when MMS has signed the documents and Taylor is in compliance with the order."  Mr. Rodi's response, quoted above, was to release the Trust Agreement itself to BP, apparently on the erroneous basis that the document was public.  Even Mr. Rodi's "guarantee" that BP would request the Trust Agreement itself was premised upon his "tell[ing] them the documents . . . are public information at this point."

47.     Finally, Mr. Rodi was incorrect that the document was already public.  As argued in Taylor's submissions to MMS, which MMS expressly declined to consider in its August Decision, the dollar amounts are confidential and proprietary information documenting Taylor's costs to overcome unique decommissioning challenges at MC Block 20.  Disclosure of that information would jeopardize Taylor and its contractors' competitive position to market such developed expertise for future complex decommissioning sites.  Moreover, the August Decision apparently also would jeopardize Taylor's financial security by freely disclosing additional sensitive information in the Trust Agreement, including Taylor's federal tax identification

number and the Trust account number.  Therefore, Mr. Rodi's representation and subsequent

disclosure to BP should be treated as an inadvertent disclosure that cannot excuse MMS'

overlooking of Taylor's well-founded claims to protect its sensitive financial information.

### D.      MMS' Decision to Release the Unredacted Disbursement Request Cover Letters

48.      The confidentiality of the disbursement request cover letters is an independent

issue before this Court.  Irrespective of the Court's findings regarding the sharing of the Trust

Agreement with BP, the cover letters have undisputedly not been shared with any third party to

date.  Moreover, they contain different and more sensitive cost information proprietary to Taylor.

49.      In its March 11 letter to MMS, Taylor agreed to the disclosure of the

disbursement request cover letters with limited redactions encompassing the specific

disbursement dollar amounts and the identity of the trustee financial institution.  Moreover,

consistent with its assertions of confidentiality for other items treated in the letter, Taylor

explained that the cover letters' redactions contained sensitive financial and commercial

information subject to Exemption 4 of FOIA, and therefore MMS could not share it with BP or

other third parties.  This proprietary information bears on Taylor's actual costs and expenses to

conduct its business of sophisticated decommissioning services.  Taylor also "reserve[d] its right

to seek to protect from disclosure future disbursement request cover letters to the extent that

those letters may contain financial or otherwise protected confidential business information."

50.      On May 19, 2009, Taylor received via express mail the MMS May Decision

subject to this action.  In relevant part, MMS stated its position that "[t]he agreement that MMS

has with BP requires it to provide BP with the cover letters of the disbursement request."  MMS

then summarily determined that Taylor's specific redactions and explanation in its March 11,

2009 letter did not merit nondisclosure.  The May Decision would also release the April 6, 2009

disbursement letter even though Taylor has never had an opportunity to exercise its reserved

right to object to its disclosure.  MMS concluded that "[c]onsequently, we may not withhold

such information under Exemption 4 of FOIA and will release the cover letters to BP 10 business

days after receipt of this notice."

51.     Based on Taylor's information and belief, MMS may reach a similar

determination with respect to the most recent disbursement request cover letter dated May 4,

2009.

52.     The BP Agreement by its terms bars MMS from sharing Taylor's documents with

BP where they are exempt from disclosure under FOIA.

53.     Taylor has advised MMS on multiple occasions, and MMS has never contended

otherwise, that disclosure to BP of Taylor's confidential business information in the

disbursement request cover letters will render such information releasable to any member of the

public, including Taylor's competitors.

54.     While bank information clearly is of a kind that is not customarily shared in any

commercial setting, and despite MMS' failure to insist upon the disclosure of the same

information in the Trust Agreement, Taylor no longer objects to disclosure of the identity of its

trustee for purposes of this action.  Taylor's trustee is a major financial institution whose identity

alone reveals nothing unique or significant regarding the Trust Fund.  Moreover, apart from the

challenged redactions in the Trust Agreement noted above, Taylor understands that MMS does

not plan to disclose any other details regarding Taylor's Trust Fund account.

55.     In its May Decision, MMS elects to disclose only the cover letters while reaching

different dispositions for similar information redacted in other Taylor documents.  Namely, the

May Decision allowed Taylor the opportunity to further substantiate the confidentiality of

analogous dollar amounts for various work efforts included in the Trust Agreement and Disbursement Agreement, pursuant to which the disbursement requests are made.  Taylor submitted such additional justification on June 2, 2009.  The MMS August Decision does not make a final ruling regarding the merits of Taylor's points and authorities.

56.     MMS' piecemeal disclosure of Taylor's proprietary information through individual disbursement request cover letters nonetheless ultimately achieves the same result as disclosing other Taylor confidential documents not covered by the May Decision (or August Decision), such as the Disbursement Agreement.  Further, whether in itemized or aggregate form, this information reflects Taylor's fundamental costs of doing business, and its disclosure to competitors and the public would likely cause Taylor substantial competitive harm.  Indeed, on this basis, the cover letters contain more sensitive actual cost information than the Trust Agreement; while the dollar amounts in the latter provide estimates of Taylor's decommissioning costs as set in March 2008, the cover letters reflect Taylor's actual expenditures.

57.     The MMS Decision insists that the BP Agreement "obliges MMS to provide BP certain documents" and "MMS intends to fulfill its obligations" thereunder, even though BP does not currently seek any Taylor documents.  Taylor's March 11, 2009 letter to MMS explains that "Taylor has worked with BP to provide BP with the information it seeks regarding Taylor's decommissioning efforts on MC Block 20."  In Attachment A thereto, BP certifies that "[a]t this time, BP is not seeking to obtain from the MMS a copy of Taylor's . . . receipts and supporting information for the trust fund release requests."

## COUNT I – ADMINISTRATIVE PROCEDURE ACT
### (Release is Arbitrary and Capricious and in Excess of Statutory Authority Under FOIA)

58.     Paragraphs 1 through 57 above are incorporated here by reference, as if fully set forth herein.

59.     The MMS May Decision and August Decision are final agency actions within the meaning of 5 U.S.C. § 704, and are thus reviewable actions as defined by the APA.  Taylor has exhausted all available administrative remedies.

60.     The disbursement request cover letters that MMS seeks to disclose to BP contain commercial or financial information falling within Exemption 4 of FOIA, i.e., specific disbursement dollar amounts reflecting Taylor's costs to undertake various specialized decommissioning activities on MC Block 20.  Taylor has continuously maintained this information as confidential.

61.     The Trust Agreement that MMS seeks to disclose to a third party FOIA requester contains related financial information similarly covered by Exemption 4.  Contrary to MMS' August Decision, the circumstances of MMS' sharing the Trust Agreement with BP failed to waive Taylor's confidentiality claims or render the Trust Agreement publicly available.

62.     Taylor will likely suffer irreparable harm if MMS releases this proprietary and confidential information to third parties, thereby making it available to any third party requester, including a commercial competitor.

63.      Therefore, unless such information is redacted, MMS is not authorized by FOIA to disclose the disbursement request cover letters or the Trust Agreement.

64.     MMS cites no other statutory or regulatory authority authorizing the disclosure of Taylor's unredacted cover letters or the Trust Agreement.  The MMS May Decision asserts that MMS' unprecedented contractual arrangement with a third party, BP, provides such independent

authority.  BP is presently seeking no documents under this BP Agreement.  Moreover, the BP Agreement recognizes that documents falling within Exemption 4 are not within its scope. Similarly, MMS' characterization of the Trust Agreement as already public is misplaced.

65.     MMS' May Decision purports to disclose Taylor's unredacted disbursement request cover letters to BP on or around June 3, 2009.  Meanwhile, MMS' August Decision intends to disclose the Trust Agreement to Platts on or around August 25, 2009.

66.      At the same time, neither MMS Decision presently required disclosure of similar commercial and financial information contained in other Taylor documents that have been subject to confidentiality discussions between Taylor and MMS.

67.     The May Decision and August Decision are therefore unlawful because they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law within the meaning of 5 U.S.C. § 706(2)(A).  They are also unlawful because they are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C).  Accordingly, Taylor is entitled to and seeks a declaration that the May Decision is unlawful and that the August Decision is unlawful, as well as a permanent injunction barring MMS' release of Taylor's unredacted disbursement request cover letters or the unredacted Trust Agreement to third parties.

## COUNT II –ADMINISTRATIVE PROCEDURE ACT
### (Release Violates the Trade Secrets Act)

68.     Paragraphs 1 to 67 above are incorporated here by reference, as if fully set forth herein.

69.     The MMS May Decision and August Decision are final agency actions within the meaning of 5 U.S.C. § 704, and thus are reviewable actions as defined by the APA.  Taylor has exhausted all available administrative remedies.

70.     As a matter of law, MMS may not disclose to any third party any information falling within the coextensive scope of the TSA and FOIA Exemption 4.

71.     The redacted financial information in the disbursement request cover letters contains Taylor's trade secrets or protected information within the meaning of the TSA, 18 U.S.C. § 1905.  The redacted information in the Trust agreement, consisting of related dollar amounts as well as specific taxpayer and bank account information, is similarly protected.

72.     Taylor will likely suffer irreparable harm if MMS releases Taylor's trade secrets or protected information to third parties.  Moreover, Taylor's injury is likely multiplied since disclosure over Taylor's objection of the cover letters to BP or the Trust Agreement to Platts legally requires MMS to make the same information available to any third party requester, including a commercial competitor.

73.     MMS' May Decision purports to disclose Taylor's unredacted disbursement request cover letters to BP on or around June 3, 2009.  Meanwhile, MMS' August Decision intends to disclose the Trust Agreement to Platts on or around August 25, 2009.  These releases of trade secrets or protected information will violate the TSA.

74.     The MMS May Decision and August Decision are therefore unlawful pursuant to 5 U.S.C. § 706(2)(A) because they are "not in accordance with law," including the TSA, and are otherwise arbitrary, capricious, and an abuse of discretion.  They are also unlawful because they are in excess of statutory jurisdiction, authority, or limitations, or short of statutory right within the meaning of 5 U.S.C. § 706(2)(C).  Accordingly, Taylor is entitled to and seeks a declaration that the May Decision is unlawful and that the August Decision is unlawful, as well as a permanent injunction barring MMS' release of Taylor's unredacted disbursement request cover letters or the unredacted Trust Agreement to third parties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Taylor respectfully requests that this Court:

1.  Declare and enter a judgment holding unlawful and setting aside the MMS May 18, 2009 Decision to release Taylor's four disbursement request cover letters in unredacted form as being arbitrary, capricious, and an abuse of discretion; otherwise contrary to law; and in excess of MMS' statutory authority;

2.  Declare and enter a judgment holding unlawful and setting aside the MMS August 10, 2009 Decision to release the Trust Agreement in unredacted form as being arbitrary, capricious, and an abuse of discretion; otherwise contrary to law; and in excess of MMS' statutory authority;

3.  Declare the MMS May 18, 2009 Decision is limited to the four disbursement request cover letters presently before the Court and has no applicability to subsequent disbursement request cover letters that have been or may be submitted by Taylor to MMS;

4.  Permanently enjoin MMS from releasing or disclosing to BP or any third party the redacted information in Taylor's disbursement request cover letters;

5.  Permanently enjoin MMS from releasing or disclosing to Platts or any other third party the redacted information in the Trust Agreement;

6.  Award Taylor its costs and reasonable attorney's fees;

7.  Grant such other and further legal or equitable relief as the Court may deem just and proper.

Dated:  August 24, 2009

Respectfully submitted,

BEVERIDGE & DIAMOND, P.C.

By: _____/s/_____
Fred R. Wagner [DC Bar No. 416009]
Peter J. Schaumberg [DC Bar No. 913202]
James M. Auslander [DC Bar No. 974898]
1350 I Street, NW, Suite 700
Washington, D.C.  20005-3311
Phone: (202) 789-6041
Fax: (202) 789-6190
fwagner@bdlaw.com
pschaumberg@bdlaw.com
jauslander@bdlaw.com
*Attorneys for Plaintiff Taylor Energy Company LLC*