# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                          )
**TAYLOR ENERGY COMPANY LLC,**            )
                                          )
    **Plaintiff,**     )
                                          )
    **v.**              )    **Civil Action No. 09-1029 (ESH)**
                                          )
**UNITED STATES DEPARTMENT OF THE**       )
**INTERIOR,** *et al.***,**               )
                                          )
    **Defendants.**      )
_____)

## MEMORANDUM OPINION

This matter is before the Court on the parties' cross-motions for summary judgment.

Plaintiff Taylor Energy Co. LLC ("Taylor") brought this action under the Administrative

Procedures Act ("APA"), 5 U.S.C. §§ 701-706, for judicial review of the May 18 and August 6,

2009 decisions by the Minerals Management Service of the Department of the Interior

(collectively, "MMS" or "the agency") to release financial information contained in (1) a trust

agreement between plaintiff and MMS which provided for plaintiff's funding of efforts to

decommission an offshore oil and gas production facility and (2) requests for trust disbursements

that plaintiff had submitted. Plaintiff argues that this financial information is protected from

disclosure under Exemption 4 of the Freedom of Information Act, 5 U.S.C. § 552(b)(4), as well

as the Trade Secrets Act, 18 U.S.C. § 1905, and that defendants' proposed release of the

information violates the APA because it is arbitrary and capricious and contrary to law. For the

reasons explained herein, the Court agrees and the agency's decisions will be vacated, plaintiff's

cross-motion for summary judgment will be granted in part, defendant's motion for summary

judgment will be denied, and the case will be remanded to the agency for supplementation of the

record and further consideration of the issues in light of this Memorandum Opinion.

## BACKGROUND

From 1984 to 1994, pursuant to an MMS lease, BP Exploration and Production, Inc. ("BP") conducted offshore oil and gas production activities in the Gulf of Mexico at Mississippi Canyon Block 20 on the federal Outer Continental Shelf ("MC 20"), including the installation of a platform and the drilling of a number of wells. (Administrative Record ("AR") 69.) In April 1994, BP assigned the MC 20 lease to plaintiff Taylor (AR 69), which continued oil and gas operations. Production ceased in September 2004 when Hurricane Ivan struck the Gulf, causing a massive mudslide that toppled the MC 20 platform and buried 28 oil and gas wells in approximately 100 feet of mud and sediment. (Am. Compl. ¶ 21.) As MC 20's lessee and operator, Taylor was required by MMS regulations to undertake certain decommissioning activities (*id.*), such as the plugging and abandoning of oil and gas wells to prevent future hydrocarbon discharges. *See generally* 30 C.F.R. §§ 250.1700-250.1752. According to William Pecue, Taylor's Senior Vice President of Operations (*see* AR 346-48 ("Pecue Aff.")), the expertise required to undertake decommissioning did not exist at that time "because a relief well project of this complexity and magnitude had never been attempted in the history of the oil and gas industry." (Pecue Aff. ¶ 5.) As a result, Taylor invested millions of dollars to fund research and testing, as well as to enter subcontracts for technical expertise, in order "to develop unique techniques, tools, and methods" specifically for the MC 20 project. (*Id.* ¶¶ 4, 9.)

To establish a secure source of funds to carry out its decommissioning obligations, Taylor and MMS negotiated an agreement under which plaintiff would establish and fund a trust for the benefit of MMS ("the Trust"), with a major financial institution serving as trustee. (AR 134; *see* AR 24-47 ("Trust Agreement").) The Trust Agreement provided that Taylor must submit for

approval a proposed "work plan" for the completion of its obligations.  (AR 26, 37.)  The Trust

Agreement also provided that upon notice from MMS to the trustee, Taylor may receive

disbursements upon satisfying various benchmarks referenced in Schedule A to the Trust

Agreement, which also sets forth the estimated work costs for meeting those benchmarks.  (AR

33; *see* AR 44-45 (Schedule A).)  Taylor and MMS also negotiated an "Agreement to Provide

Additional Bond" (*see* AR 14-23 ("Bond Agreement")), whereby Taylor would pay into the

Trust the proceeds from the sale of "substantially all of [its] Gulf of Mexico assets, including oil,

gas[,] and mineral leases . . . ."  (AR 14.)  The Trust and Bond Agreements were both executed

on March 19, 2008.

Due to BP's prior activities at MC 20, it had also accrued decommissioning obligations

under MMS regulations.  *See* 30 C.F.R. § 250.1702.  In June 2008, MMS and BP executed a

separate agreement that apparently contemplated the possibility of Taylor's inability to satisfy its

obligations.  (AR 68; *see* AR 69-71 ("BP-MMS Agreement").)  Under the BP-MMS Agreement,

if MMS requires BP to undertake decommissioning activities, then BP would be eligible for

disbursements from the Trust even though it was not a party to the Trust Agreement.  (*See* AR

69-70.)  The agency also agreed to give BP advance notice of trust disbursements to Taylor, as

well as the right to review Taylor's work plan, trust disbursement requests, and related

documents "except to the extent these documents are exempt from disclosure under the Freedom

of Information Act . . . ."  (AR 70.)  By its terms, the BP-MMS Agreement was made retroactive

to March 19, 2008, the same day that MMS executed the Trust Agreement.  (AR 69.)[1]

In May 2008, Taylor submitted to MMS its proposed work plan for decommissioning

activities, characterizing the documents as "confidential proprietary and commercial information

---

[1] According to plaintiff, "MMS entered into the BP Agreement without Taylor's
knowledge or participation." (Am. Compl. ¶ 30.)

. . . ." (AR 55.)  In November, Taylor and MMS executed an agreement governing how Taylor could request trust disbursements ("the Disbursement Agreement").  (*See* AR 134-41.)  Pursuant to the Disbursement Agreement, Taylor first requested trust disbursements by letters dated November 24 and December 1.  (*See* AR 403-05, 406-15.)

On December 19, 2008, Taylor responded by email to an agency request to clarify which of Taylor's documents related to MC 20 could be released as "publicly available."  (AR 300.)  In relevant part, Taylor's email explained that the Trust Agreement was not and should not become publicly available.  (*Id.*)  The email also explained that MMS could release the Disbursement Agreement and the disbursement request letters "with appropriate standard FOIA redactions," but that the request letters' supporting documentation should not be released because it contained confidential "pricing information."  (*Id.*)  By letter dated January 20, 2009, Taylor made a third disbursement request.  (*See* AR 416-22.)

On February 2, 2009, the agency requested that Taylor identify the "specific passages" of the disbursement request letters to be exempted from disclosure, as well as "the FOIA rationale for withholding that information."  (AR 332.)  The agency also requested that Taylor explain its grounds under FOIA for not releasing the Trust Agreement.  (*Id.*)  On March 11, Taylor responded that the Trust Agreement and its disbursement request letters could be released with redactions of financial information protected under FOIA Exemption 4, including the specific dollar values of the initial trust deposit, work costs, and disbursement requests.  (AR 336, 341; *see* AR 361-84, 403-04, 406-07, 416-17.)  The letter was accompanied by an affidavit by Pecue (*see generally* Pecue Aff.) and "incorporate[d] by reference" Taylor's prior responses to the agency (AR 336), which had offered detailed arguments that Taylor would suffer competitive harm from the release of "confidential commercial information."  (*See, e.g.*, AR 122-25.)  The

letter also voiced concern that MMS was seeking to disclose these documents to BP pursuant to the BP-MMS Agreement as opposed to a FOIA request.  (AR 337.)  Thereafter, on April 6 and May 4, Taylor submitted two more disbursement requests.  (*See* AR 424-28, 429-30.)

On May 18, 2009, the agency issued a final decision ("the May Decision") regarding the first four of Taylor's disbursement request letters but not the fifth letter of May 4.  (AR 469; *see* AR 472-79.)  The decision asserted that Taylor's prior letter "provide[d] no discernable basis" for the proposed redactions, "other than to identify [the redacted material] as financial information."  (AR 469.)  Although the decision did not state that there was actually a FOIA request for the letters, it stated that as a result of Taylor's failure to comply with FOIA regulation 43 C.F.R. § 2.23(e), the agency would release the letters to BP in full after 10 business days (*i.e.*, on June 3) in order "to fulfill its obligations under" the BP-MSM agreement.  (*See* AR 467, 469-70.)

The May Decision also discussed the Trust Agreement, but it did not issue a final decision.  The agency stated that MMS had received a formal FOIA request for the document, but it did not identify the requester (AR 468); Taylor later learned that that it was Platts Oilgram News ("Platts").  (*See* AR 294-95, 298.)  The May Decision further stated that MMS would "consider [plaintiff's] claims of confidentiality" if submitted by June 2 (AR 470), along with "a specific and detailed discussion" of "[w]hether the Government required the information in question to be submitted, and if so, how substantial harm would likely result from release . . . .'" (AR 468 (quoting 43 C.F.R. § 2.23(e)(1)(i)).)

Subsequently, Taylor informed the agency that it would sue to prevent the release of the cover letters.  On May 29, 2009, the agency agreed that if Taylor sued before June 3, it would refrain from releasing the letters pending a court decision.  (AR 481-82.)

By letter dated June 2, 2009, Taylor presented the agency with, *inter alia*, the requested confidentiality analysis of the proposed redactions of dollar values from the Trust Agreement. (*See* AR 486-87.)  Plaintiff argued that "the information that MMS seeks to disclose reflects Taylor's pure costs for conducting decommissioning and associated work in satisfaction of its own obligations at MC Block 20," and that "Taylor is presently engaged in the business of marketing and providing" decommissioning services based on the unique expertise it was acquiring through its MC 20 work.  (AR 486.)  However, Taylor argued, the fact that it had already agreed to release the Trust Agreement's descriptions of decommissioning operations meant that the release of Taylor's costs for that work would enable competitors and customers to learn about its "cost structure and operations," which would in turn allow competitors to "undercut Taylor's market prices" and "encourag[e] customers to 'ratchet down' the prices Taylor will seek for its services."  (AR 487.)  Taylor cited a number of legal authorities for its position that "'information that competitors could use to derive a firm's profit margin constitutes serious competitive harm.'"  (*Id.* (quoting *Public Citizen Health Research Group v. Nat'l Inst. of Health*, 209 F. Supp. 2d 37, 48-49 (D.D.C. 2002)).)[2]

Taylor's June 2 letter also argued that in light of the May Decision's reservation of judgment as to the Trust Agreement, it was "incongruous" for the decision to have made a final determination regarding the disbursement request letters.  (AR 488.)  Taylor contended that its arguments for redacting the dollar figures in the Trust Agreement were equally applicable to the dollar values in those letters, and therefore the agency's ongoing consideration of those arguments as to the Trust Agreement "warrant[ed] . . . reassessment" of the decision to release

---

[2] Taylor also objected to the fact that although Platts had requested the Trust Agreement on December 11, 2008 (*see* AR 298), Taylor had not received "prompt written notice of the request," including a copy of the request, as required by 43 C.F.R. § 2.23(a) & (b).  (*See* AR 485.)

the letters.  (AR 488-89.)  Taylor further objected to the agency's insistence on disclosing the letters despite (1) the absence of any FOIA request, (2) BP's assurances that that it was not currently seeking the information, and (3) the fact that Taylor never had the opportunity to assert confidentiality for the April and May 2009 letters.  (AR 489.)

On June 3, 2009, Taylor filed this action to challenge the May Decision to release the letters.  Subsequently, on August 6, MMS issued a final decision to disclose the Trust Agreement in its entirety ("the August Decision").  (AR 491-92.)  That decision explained that although the agency was "not persuaded" by Taylor's claims that the Trust Agreement's financial information was confidential, it did not need to "specifically address [those] claims."  (AR 491.)  Instead, the agency took the position for the first time that Taylor "already made the Trust Agreement public" and therefore "waived its right to claim that any information in the Trust Agreement is confidential."  (AR 491-92.)  To support this conclusion, the agency cited a March 19, 2008 email exchange between MMS Deputy Regional Director John Rodi and Taylor's General Counsel Frank Barber, which took place as MMS was executing the Trust and Bond Agreements.  (*Id.*; *see* AR 48-50 (March 19, 2008 email exchange).)  The August Decision characterized this email exchange as one where Rodi asked Barber "if MSM could provide BP a copy of the Trust Agreement and [Rodi] informed [Barber] that the release of the Trust Agreement to BP would make the document public information," after which Barber gave Taylor's assent to the release.  (AR 491.)  The August Decision concluded that on these facts, the Trust Agreement could not be withheld under Exemption 4 because "Taylor ha[d] already made all the information in the Trust Agreement public," and the document would be released to the requester in its entirety.[3]  (AR 492.)

---

[3] The agency had previously indicated that the requester was willing to accept all of Taylor's proposed redactions except for the dollar values.  (AR 468.)

In response to the August Decision, Taylor filed an amended complaint on August 24,

2009.  It now seeks a declaration that the May and August Decisions are unlawful and that the

May Decision only encompasses plaintiff's first four disbursement request letters.  (Am. Compl.

at 21 ¶¶ 1-7.)  Taylor also requests that the Court set aside the May and August decisions and

"permanently enjoin the release of the protected information in the disbursement request cover

letters and the Trust Agreement."  (*Id.*)  On March 1, 2010, Taylor moved for summary

judgment, followed by defendants' cross-motion on April 15.

ANALYSIS

I.    **LEGAL STANDARD**

A.    **APA Review**

In a typical "reverse-FOIA" action, "a submitter of information – usually a corporation or

other business entity required to report various and sundry data on its policies, operations, or

products – seeks to prevent the agency that collected the information from revealing it to a third

party in response to the latter's FOIA request.  The agency's decision to release the data

normally will be grounded either in its view that none of the FOIA exemptions applies, and thus

that disclosure is mandatory, or in its belief that release is justified in the exercise of its

discretion, even though the data fall within one or more of the statutory exemptions."  *CNA Fin.*

*Corp. v. Donovan*, 830 F.2d 1132, 1133 n.1 (D.C. Cir. 1987).  Such a challenge is brought under

§ 10(a) of the APA, 5 U.S.C. § 702.  *See id.*

"When the district court decision under review itself reviews agency action under the

APA," the Court may "reverse the agency action only if it is 'arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law.'"  *United Techs. Corp. v. U.S. Dep't of*

*Defense*, 601 F.3d 557, 562 (quoting 5 U.S.C. § 706(2)(A)).  "This 'standard is narrow and a

court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made.'" *Id.* (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

"'An agency's discretionary order [will] be upheld, if at all, on the same basis articulated in the order by the agency itself.'" *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 686 (D.C. Cir. 2005) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 169 (1962)). Accordingly, courts "'do not defer to the agency's conclusory or unsupported suppositions,'" *United Techs.*, 601 F.3d at 562 (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)), and counsel's "*post hoc* rationalizations" cannot substitute for an agency's failure to articulate a valid rationale in the first instance. *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005); *see Burlington Truck Lines*, 371 U.S. at 169. Such agency litigating positions "are not entitled to deference because they do not necessarily reflect the views of the agency, but rather may have been developed hastily, without adequate consideration of opposing positions pursuant to the agency's normal deliberative process." *Public Citizen, Inc. v. Lew*, 127 F. Supp. 2d 1, 10 (D.D.C. 2000).

## B.     FOIA Exemption 4

"In enacting FOIA, the Congress sought to balance the public's interest in governmental transparency against 'legitimate governmental and private interests [that] could be harmed by release of certain types of information.'" *United Techs.*, 601 F.3d at 559 (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc)). "When an agency determines, pursuant to a FOIA request, to disclose information gathered from

a non-governmental source, the source may contest the disclosure as arbitrary and capricious or not in accordance with law under the Administrative Procedure Act." *Id.* (citations omitted).

"Exemption 4 covers 'trade secrets and commercial or financial information [that is] obtained from a person and [is] privileged or confidential.'"[4] *United Techs.*, 601 F.3d at 563 (quoting 5 U.S.C. § 552(b)(4)). The exemption thus "excepts confidential information from FOIA's scope." *Id.* at 559. "[I]f a 'person' provides information to the United States voluntarily, the information is confidential if 'it is of a kind that the provider would not customarily release to the public.'" *Id.* at 559 n.3 (quoting *Critical Mass*, 975 F.2d at 880). But "if a 'person' is *required to* provide information to the United States, the information is confidential under Exemption 4 only if its 'disclosure would be likely either (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained.'" *Id.* at 559 (quoting *Critical Mass*, 975 F.2d at 878) (footnote omitted, emphasis in original).

### C.       Trade Secrets Act

The Trade Secrets Act ("TSA") is a criminal statute that prohibits government personnel from "disclos[ing]" "any information" relating "to the trade secrets, processes, operations, style of work, or apparatus" or "to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures" of any person, if the disclosure is "not authorized by law." 18 U.S.C. § 1905. "Although the proprietor of commercial information does not have a private right of action to enforce § 1905, it may seek review of an agency action that violates the

---

[4] The only issue here is whether the information provided by Taylor to MMS is "confidential." FOIA's definition of "'person' includes an individual, partnership, corporation, association, or public or private organization other than an agency," *id.* § 551(2), and the information consists of dollar values and other financial information related to Taylor's decommissioning operations.

Trade Secrets Act on the ground it is 'contrary to law,' per § 10 of the Administrative Procedure Act." *McDonnell Douglas*, 375 F.3d at 1186 n.1 (citation omitted); *see also Megapulse, Inc. v. Lewis*, 672 F.2d 959, 964 (D.C. Cir. 1982) (holding that "'a party to a government contract can seek an injunction in [district] court to prevent an alleged violation of the Trade Secrets Act when the disputed data was divulged to the government in order to fulfill the terms of various contracts'" (quoting district court but reversing dismissal for lack of jurisdiction)). The TSA is often relevant in reverse-FOIA actions, because "[t]o the extent that such data as trade secrets and confidential financial information are excepted from mandatory disclosure by one or more of the exemptions that Congress has incorporated into FOIA, the Trade Secrets Act will bar a discretionary release unless, after notice and comment, an agency, possessing delegated power to do so, promulgates, a contrary rule having the force of law." *CNA*, 830 F.2d at 1142.

## II.     CONFIDENTIALITY OF THE TRUST AGREEMENT

The August Decision to release the Trust Agreement rested on the ground that Taylor had "already made [it] public" and therefore "waived its right to claim that any information in the Trust Agreement is confidential."[5] (AR 491.) Taylor argues that this decision is unsupported by the record and is arbitrary and capricious. (Mem. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mot.") at 25.) The Court agrees.

Whether a plaintiff previously disclosed confidential information to the public is a factual

_____

[5] The August Decision also stated that while the agency was "not persuaded" by Taylor's confidentiality claim that the information "would generally qualify as confidential business information," it did not need to "specifically address" the merits of Taylor's claim. (AR 491.) The Court must therefore reject defendants' recent attempt to argue here that the financial information in the Trust Agreement is not protected from disclosure as confidential. (*See* Defs.' Cross-Mot. for Summ. J. ("Defs.' Opp'n") at 19-30.) For, as Taylor rightly notes (Reply in Supp. of Pl.'s Mot. ("Pl.'s Reply") at 6), this argument was not a basis "'articulated in the order by the agency itself,'" *Kreis*, 406 F.3d at 686 (quoting *Burlington Truck Lines*, 371 U.S. at 169), so the Court cannot credit counsel's "*post hoc* rationalizations" for why the August Decision rejected Taylor's confidentiality argument. *El Rio Santa Cruz*, 396 F.3d at 1276.

question, *see Airborne Data, Inc. v. United States*, 702 F.2d 1350, 1359 (Fed. Cir. 1983)

(observing that arguments against information's confidentiality, such as "prior public disclosure

by plaintiff," "turn on considerations which are factual in nature"), and the party arguing that

confidential information has become "publicly available" – here, the agency – bears the burden

of production. *See Occidental Petroleum Corp. v. S.E.C.*, 873 F.2d 325, 342 (D.C. Cir. 1989).

The only evidence cited by the August Decision to meet this burden of production was the March

19, 2008 email exchange between MMS official Rodi and Taylor's general counsel Barber. (*See*

AR 48-50 (email exchange).) The decision characterized Barber as having agreed to release the

Agreement to BP after he "was informed that *the release of the Trust Agreement to BP would

make* the document public information." (AR 491 (emphasis added).)

The agency, however, mischaracterizes the record. On March 19, 2008, hours before the

Trust Agreement's execution, a BP official informed a Taylor official that it would not agree to

execute Taylor's "Designation of Operator" ("DOO") request unless BP "receive[d] assurances"

that Taylor had "satisfied the MMS' demand for additional financial security related to MC 20."

(AR 50.) Although the record does not clarify the significance of BP's execution of the DOO

request, it appears to have been a prerequisite to Taylor's ability to sell its oil and gas leases in

order to fund the Trust. (*See* Pl.'s Mot. at 6, 26.)[6] Later that same day, Barber forwarded BP's

message to Rodi and requested that Rodi notify BP once the agency had signed "the documents"

---

[6] MMS regulations define an "operator" as the person designated by an offshore
production lessee "as having control or management of operations on the leased area or a portion
thereof." 30 C.F.R. § 250.105. Where there are multiple lessees (including assignees), each
lessee must submit an executed DOO form to the MMS Regional Supervisor, who "must
approve the designation before the designated operator may begin operations on the leasehold."
*Id.* § 250.143(a).

(*i.e.*, the Trust and Bond Agreements).[7]  (AR 49.)  Rodi responded twenty minutes later to confirm that the agency had signed the documents.  (*Id.*)  Rodi also asked whether Barber wanted him to send a copy of the Agreements to BP because, in Rodi's words, "I can guarantee they will ask for one as soon as I tell them the documents are executed and *the documents are public information at this point*."  (*Id.* (emphasis added).)  Barber responded four minutes later: "That's fine with Taylor Energy Company LLC.  Thanks for your help."  (*Id.*)

Contrary to the August Decision, Barber was never told that the agency's disclosure of the Trust Agreement to BP *would make* the document public information.  The August Decision's failure to properly characterize the evidence upon which it relied prevents the Court from concluding that the agency "'examine[d] the relevant data,'" as is necessary before the Court can determine whether there was "a 'rational connection between the facts found and the choice made.'"  *United Techs.*, 601 F.3d at 562 (quoting *Motor Vehicle Mfrs.*, 463 U.S. at 43)).  Because the August Decision justified its determination that Taylor waived the Trust Agreement's confidentiality by reference to non-existent facts, it is arbitrary and capricious.[8]

---

[7] The emails do not state that both agreements were disclosed, but the documents which Rodi eventually sent to BP were 34 pages long (*see* AR 48), which is the combined length of the Trust and Bond Agreements.  (*See* AR 14-47.)

[8] The agency also argues the information in the Trust Agreement is not secret because the agency disclosed similar information on its website.  (Defs.' Opp'n at 14-15.)  This was not a rationale articulated in the August Decision, so the argument is not properly raised here.  *See Kreis*, 406 F.3d at 686; *see also supra* note 5.  Taylor also contends that the information on the website is not "identical" to that contained in the Trust Agreement (Pl.'s Reply at 18), as it must be under the public availability test.  *See Ctr. for Auto Safety v. Nat'l Traffic Safety Admin.*, 244 F.3d 144, 151-52 (D.C. Cir. 2001).  In addition, "[t]he mere fact of mention in a public document is not controlling" on the question of whether a secret is now public knowledge, because "no one may have noticed the document."  *BondPro Corp. v. Siemens Power Generation, Inc.*, 463 F.3d 702, 706 (7th Cir. 2006); *see, e.g.*, *DVD Copy Control Ass'n Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (Cal. Ct. App. 2004) ("Widespread, anonymous publication of the information over the Internet may destroy its status as a trade secret.  The concern is whether the information has retained its value to the creator in spite of the publication.  Publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise

Even if the August Decision had accurately characterized the email exchange, it is not necessarily the case that Barber's willingness to let the agency send the Trust Agreement to BP constituted a public disclosure that abrogated the secrecy of the information therein. Plaintiff correctly argues that "[n]ot all disclosures are created equal; context matters as to whether a limited disclosure places that information in the public domain." (Pl.'s Reply at 15.)[9] For example, the doctrine of trade secrets clarifies that limited publication of confidential information for a restricted purpose, if made in express or implied confidence, does not abrogate the information's secrecy. *See Space Aero Products Co. v. R. E. Darling Co.*, 208 A.2d 74, 82 (Md. 1965); *MicroStrategy Inc. v. Li,* 601 S.E.2d 580, 588 (Va. 2004). The March 19, 2008 emails suggest that Barber assented to the disclosure for the purpose of quickly securing BP's execution of Taylor's DOO request. Therefore, assuming *arguendo* that an analogy to trade secret doctrine is appropriate here, the disclosure to BP arguably constituted a limited publication of the Trust Agreement for a specific purpose, and if it was made in confidence, whether express or implied, there would be no waiver. *See, e.g.*, *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (finding that limited disclosure of computer program code to defendant "in contemplation of a licensing agreement" did not destroy secrecy because code was given "in

limited so that it does not become generally known to the relevant people, *i.e.*, potential competitors or other persons to whom the information would have some economic value." (citations omitted)).

[9] However, because the facts show at a minimum that the agency circulated the information with Taylor's knowledge, the Court is not persuaded by plaintiff's reliance on cases where agency disclosures were made without the participation of the parties whose rights were implicated by the disclosed information. *See, e.g.*, *Martin Marietta Corp. v. Dalton*, 974 F. Supp. 37, 40 (D.D.C. 1997) (observing that "[t]he prior release of information to a limited number of requesters does not necessarily make the information a matter of common public knowledge," where agency had released information "without [the submitter's] knowledge or consent"); *Canning v. U.S. Dep't of Justice*, 567 F. Supp. 2d 85, 95 (D.D.C. 2008) (concluding, where agency inadvertently failed to redact law enforcement official's name from one document, that "[i]t would be contrary to the spirit of FOIA to deprive an individual of his privacy rights because of an agency's administrative error").

confidence"); *Motorola, Inc. v. Computer Displays Int'l, Inc.*, 222 U.S.P.Q. 844, 852-53 (7th Cir. 1984) (explaining that plaintiff's disclosure did not destroy secrecy where it had "a business purpose for this disclosure" and there was evidence that "business ethics required [the recipients] to maintain [the disclosed secret] in confidence"), *amended on denial of mot. for reh'g*, 739 F.2d 1149 (7th Cir. 1984); *Space Aero*, 208 A.2d at 83 (Md. 1965) (finding that trade secret existed despite third party's knowledge because plaintiff and third party "were working together, as manufacturer and supplier, in what was, to some extent at least, a joint enterprise" and there was evidence of "some element of confidence and trust in the relationship"); *Hoeltke v. C.M. Kemp Mfg. Co.*, 80 F.2d 912, 923 (4th Cir. 1935) (finding that confidential relationship was implied "in equity and good conscience" where plaintiff disclosed unpatented invention to defendant in contemplation of sale).

"Notwithstanding the fact that [MMS's] adjudication fails to withstand APA scrutiny," the Court cannot determine "whether plaintiff is entitled to judgment as a matter of law," because there is "insufficient evidence in the administrative record to warrant an outright reversal of [MMS's] decision." *Chem. Waste Mgmt., Inc. v. O'Leary*, No. 94-CV-2230, 1995 WL 115894, at *6 (D.D.C. Feb. 28, 1995). This is not Taylor's fault, as it never had the occasion to present the agency with evidence or argument about the relevance of the March 19, 2008 emails. The August Decision was the first time that "the question of public availability was apparently brought to [plaintiff]'s attention," and thus the agency "ruled on a ground of which [plaintiff] had no prior notice and to which it had had no opportunity to respond." *Occidental Petroleum*, 873 F.2d at 342. Accordingly, the Court will vacate the August Decision, deny defendants' motion for summary judgment as to the Trust Agreement, and remand the issue to the agency for further

consideration and supplementation of the record as necessary on the issue of waiver.[10]  *See id.* at

347; *Chem. Waste Mgmt.*, 1995 WL 115894, at *6.

## III.    CONFIDENTIALITY OF THE DISBURSEMENT REQUEST LETTERS

Taylor argues that the dollar figures contained in the disbursement request letters

constitute confidential cost information protected from disclosure, and that the May Decision to

release those letters to BP is arbitrary and capricious and contrary to law.  (Pl.'s Mot. at 17.)  The

Court agrees that the May Decision offered no valid legal or factual reason for rejecting

plaintiff's arguments against the letters' release.

The May Decision rejected plaintiff's challenge solely for a failure to comply with 43

C.F.R. § 2.23.   It stated:

> Your request to redact the name of the trustee and the amounts of the
> disbursements information from the disbursements cover letters *fails to comply
> with the requirements of 43 CFR § 2.23(e) cited above.  Consequently*, we may
> not withhold such information under Exemption 4 of FOIA and will release the
> cover letters to BP 10 business days after receipt of this notice.

(AR 469 (emphases added).)

First, § 2.23 does not apply to this situation.  The regulation sets forth procedures that

apply when the agency *receives a request under FOIA.  See* 43 C.F.R., Part 2, Subpart C

(entitled "Request for Records Under the FOIA"); *id.* § 2.23 (entitled "How will a bureau handle

*a request* for commercial or financial information that it has obtained from a person or entity

outside the Federal Government?" (emphasis added)); *id.* § 2.23(a) (requiring written notice to

confidential information's submitter if agency "receives a FOIA request" for that information).

As Taylor repeatedly emphasizes, BP has never submitted a FOIA request for plaintiff's

disbursement letters.  (*See, e.g.*, Pl.'s Mot. at 17.)   In fact, prior to the May Decision, "BP ha[d]

---

[10] In the event that the agency agrees with plaintiff that no waiver has occurred, it must
then address the merits of plaintiff's Exemption 4 arguments.

clearly stated" to the agency that it was "no longer requesting the information from Taylor" that

was referenced in the agency's February 2, 2009 letter (AR 344), which included the

disbursement requests letters. (*See* AR 332.) Instead, the May Decision explained that the

agency wants to disclose the letters to BP because it perceives itself bound to do so under the

BP-MMS Agreement.[11] (*See* AR 467, 469.)

Because there is no FOIA request at issue, plaintiff's challenge to the release of the letters

does not present a typical "reverse-FOIA" claim. Rather, it is a straightforward administrative

challenge involving the Trade Secrets Act.[12] *See, e.g.*, *Dowty Decoto, Inc. v. Dep't of Navy*, 883

F.2d 774, 775-76 (9th Cir. 1989) (affirming subcontractor's permanent injunction against Navy's

disclosure of technical data in APA/TSA challenge unrelated to FOIA). There is no apparent

reason why such a challenge would be governed by the agency's FOIA regulations. As

defendants concede, "the [agency's FOIA] regulations by their terms do not apply in the absence

of a FOIA request," so they have no application where "there was no FOIA request from BP to

---

[11] As plaintiff suggests, the absence of a FOIA request for its purportedly confidential information raises a question of whether the agency's disclosure of that information to BP would be "authorized by law" within the meaning of the Trade Secrets Act. (Pl.'s Mot. at 17-18.) The agency insists that the BP-MMS agreement provides the necessary legal authority for disclosure, but the D.C. Circuit is clear that at a minimum, such authorization must come from properly promulgated regulations. *See CNA*, 830 F.2d at 1142 ("[T]he Trade Secrets Act will bar a discretionary release unless, after notice and comment, an agency, possessing delegated power to do so, promulgates, a contrary rule having the force of law."); *Canadian Commercial Corp. v. Dep't of Air Force*, 514 F.3d 37, 39 (D.C. Cir. 2008) ("[U]nless another statute or a regulation authorizes disclosure of the information, the Trade Secrets Act requires each agency to withhold any information it may withhold under Exemption 4 of the FOIA.").

[12] In the absence of a FOIA request, it is unclear what must be shown in order to demonstrate that the TSA bars the agency from releasing its information. The D.C. Circuit has left open the question of whether the TSA's protection is *broader* than Exemption 4. *See CNA*, 830 F.2d at 1151 ("It is our considered view . . . that the scope of the Act is *at least* co-extensive with that of Exemption 4 of FOIA . . . ." (emphasis added)). The May Decision stated only that the agency intends to provide BP with the documents under the BP-MMS Agreement, "consistent with the provisions of" FOIA. (AR 467.) The decision is silent on the question of whether the agency considered the TSA and its scope.

trigger application of the formal process set out" in those regulations. (Defs.' Reply to Pl.'s Reply ("Defs.' Sur-reply") at 16 (arguing in context of Trust Agreement).) Yet, the May Decision did not explain why 43 C.F.R. § 2.23 was applicable to Taylor's challenge, nor did it explain why Taylor's non-compliance with § 2.23(e) "[c]onsequently" justified rejecting that challenge. (AR 469.)[13]

Second, even if 43 C.F.R. § 2.23 were applicable to this situation, the agency failed to apply it evenhandedly. It invoked non-compliance with § 2.23(e) as a basis for rejecting plaintiff's claim, yet the agency itself did not comply with any of the regulation's procedural requirements. For example, the record does not show that the agency ever complied with its burden to show what would be released by "[d]escribing the information requested *or includ[ing] copies of the pertinent records*." 43 C.F.R. § 2.23(b)(2) (emphasis added).[14]

Third, the May Decision did not address any of the arguments or evidence that plaintiff had presented in previous submissions, including its March 11, 2009 letter and Pecue's accompanying affidavit, which attested to Taylor's efforts to market its unique expertise. (*See* AR 486-88; Pecue Aff. ¶¶ 6-8.) Taylor's supposed non-compliance with § 2.23(e) was not "a reasoned basis" for the agency to reject these submissions out of hand. *United Techs.*, 601 F.3d

---

[13] The record shows that the agency alone was responsible for misapplying § 2.23(e). In Taylor's letter from counsel that preceded the May Decision, Taylor noted that MMS had not yet received any FOIA requests for any of Taylor's documents. (AR 337.) "Therefore," Taylor argued, "nothing more than an abstract basis exists for MMS' disclosure determination pertaining to Taylor's records," and it "reserve[d] the right to revise or supplement its . . . responses in the future as necessary to respond to actual requests for Taylor's confidential information." (*Id.*) Taylor then cited 43 C.F.R. § 2.23 solely in order to highlight the notice, objection, and appellate rights that Taylor would have upon the agency's receipt of an actual FOIA request. (*See id.*) The May Decision followed, erroneously applying § 2.23's procedural requirements to Taylor's challenge to the letters' release.

[14] Nor does the record show that the agency ever provided Taylor with prompt written notice of Platt's request for the Trust Agreement, as required by 43 C.F.R. § 2.23(a) & (b). (*See* AR 485.)

at 564 ("[W]here, as here, a contractor pinpoints by letter and affidavit technical information it believes that its competitors can use in their own operations, the agency must explain why substantial competitive harm is not likely to result if the information is disclosed.").

Fourth, even assuming that § 2.23 were applicable here, the May Decision arbitrarily considered only part of § 2.23(e) when rejecting Taylor's challenge. In its entirety, § 2.23(e) requires that a party objecting to a FOIA disclosure on the basis of confidentiality must explain "(i) [w]hether the Government required the information in question to be submitted, and if so, how substantial competitive or other business harm would likely result from release; *or* (ii) [w]hether the submitter provided the information voluntarily and, if so, how the information in question fits into a category of information that the submitter customarily does not release to the public." 43 C.F.R. § 2.23(e)(1) (emphasis added). However, the May Decision rejected Taylor's arguments solely on the ground that Taylor did not satisfy the first prong regarding "required" submissions. (*See* AR 468-69 (quoting only § 2.23(e)(1)(i).) The record therefore fails to show that the agency ever considered whether Taylor satisfied the second prong regarding "voluntarily" submitted information. *See* 43 C.F.R. § 2.23(e)(1)(ii). This raises the question of whether the agency excluded, without explanation, the possibility that Taylor's information fell into that second category and was therefore subject to a different legal standard than the one upon which the May Decision relied.[15]

Finally, the arbitrariness of invoking § 2.23(e) to reject plaintiff's challenge to the letters' release is compounded by the May Decision's dissimilar treatment of Taylor's challenge to the

---

[15] Defendants assert for the first time in their opposition that Taylor's disbursement requests were not "voluntary" submissions because they were required by the terms of the Trust and Disbursement Agreements. (Defs.' Opp'n at 19-21.) The May Decision did not articulate this as a basis for rejecting Taylor's challenge, so the Court will not consider the argument. *See supra* note 5.

release of the Trust Agreement, for which a FOIA request *did* exist.  In its March 2009 legal letter, Taylor made virtually identical arguments for redacting the Trust Agreement and the disbursement request letters.  (*See* AR 341.)  The May Decision rejected these arguments for non-compliance with § 2.23(e) *only* with respect to the letters; as for the Trust Agreement, Taylor was allowed to supplement its arguments.  (*See* AR 468, 470.)  Plaintiff rightly noted during the administrative proceeding that such disparate treatment for similarly situated arguments is "incongruous."  (AR 488.)  This disparate treatment further calls into question the agency's refusal to "reassess[]" the May Decision upon receiving Taylor's June 2, 2009 confidentiality arguments, because those arguments were just as applicable to the disbursement request letters as they were to the Trust Agreement.  (*Id.*)

Although the May Decision is arbitrary and capricious, the record is insufficient to warrant its "outright reversal."  *See Chem. Waste Mgmt.*, 1995 WL 115894, at *6.  Accordingly, the Court will vacate the May Decision, deny defendant's motion for summary judgment as to the disbursement request letters, and remand the issue to the agency so it can determine whether the letters may be disclosed in the absence of a FOIA request.  If the agency determines that they may disclosed, then the agency should also determine the proper legal standard for disclosure and whether the arguments and evidence offered in plaintiff's submissions (including its June 2, 2009 letter) satisfies that standard.

**CONCLUSION**

For the foregoing reasons, the Court vacates the agency's decisions of May 18 and

August 6, 2009.  Plaintiff's motion for summary judgment is granted in part, defendants' motion

for summary judgment is denied without prejudice, and the case is remanded to the MMS for

further proceedings consistent with this Memorandum Opinion.

**SO ORDERED.**

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:  August 31, 2010